Good morning, Your Honor. Mark Overland on behalf of the appellants and plaintiffs. And with me is my partner, Courtney Overland. With the court's permission, I'm legally blind, so hopefully with her help I'll be adequate.  Your Honor, this case is about a Riverside County Sheriff correctional policy, and if I may refer to it as the policy, which exists and was created by executive local officers in the city of Riverside County. for the express purpose of protecting inmates and staff. State law mandates local jails to create these policies. And the evidence below shows that correctional officers in the Riverside County Jail repeatedly violated the policy in specific instances, which are specifically referred to in our briefs, the opening brief, pages 4 to 7, and the reply brief at pages 2 to 5, with citations to the record. The conduct of these officers resulted in an inmate by the name of William Espinoza, who was in his 60s, blind in one eye, with no mental health history, and particularly vulnerable to other inmates. He was placed in the same cell with Mr. Alvarez, who was 40 years younger, had a history of mental illness, and a history of bizarre and violent behavior, which was well documented in the jail records. Shortly after being placed in the same cell with Mr. Espinoza, Mr. Alvarez violently attacked him, beat him, and killed him. The question for this court to decide is, do these violations of the policy by these correctional officers at the Riverside Jail raise a presumption of negligence that the court should have instructed on, but failed to do so to the jury? The second question is, and if the court did err in doing so, is this reversible error? Respondent's claim is that the answer to those questions is no to both of them. The reason for it, they claim, is the interpretation of California Evidence Code Section 669, on which the presumption of negligence is based, and Evidence Code 669.1, which creates exemptions to this presumption for public employees. Now, in support of their argument, the respondents focus basically on one part of the exceptions to the presumption of 669.1. That requires the Rule Policy Manual or Guidelines, which the policy clearly is, which is referred to in 669, to be adopted as an ordinance or a statute. Respondents also rely on judicial precedent, California State Judicial Precedent, involving what are purely internal policies of a local agency or a local department. And the question is whether their interpretation and their reference to applicable law is accurate. And I submit it is not. And perhaps the strongest relevant case that applies in this case was cited by the respondents on page 13 of their brief, and also was relied on by the district court judge in denying the motion for new trial, based on the failure to give the negligence per se instruction. And that is the case of Strong versus the State of California. And Strong dealt with particularly internal policies, guidelines, of the California Highway Patrol. And in stating that the presumption of Evidence Code Section 669 did not apply, the Strong court held at pages 1450 to 1452 that there was no way in which the State of California could in the case that the guidelines in the manual of the California Highway Patrol, or the form number 555 on which the case was based, was the product, the product of a law passed by the legislature or adopted pursuant to the administrative procedure act. That's the California Administrative Procedure Act. Here, the Riverside policy itself in the first page, if you look under the references it has, makes reference to the California Administrative Procedure Act sections 1050, 1052, and 1053. And that's the excerpt of the record, page 38. And as we noted on page 7 of our reply, California does not distinguish between delegation of authority by statute or administrative regulations. That's the Eastside Union High School District case. A question arises as under section 669.1, which is the exception to the presumption, and the Administrative Procedure Act is whether this manual or guideline was adopted by an agency of the state. And the agency of the state that's involved here is the Board of State and Community Corrections. And the authority for that is based on penal code section 6030. The focus of the respondent in this case is the ultimate product. The ultimate product are the policies. There's no focus on how those policies were arrived at. And it's clear, based on sections 1050, 1052, and 1053, that the policies were arrived at pursuant to a mandate and delegation of authority by a state agency to the local agency over which it has oversight to create these policies, giving specific guidelines, general guidelines to be followed, and filling in the details. Clearly a delegation of authority that's recognized to be valid. But it's also clear that contrary to the strong case, what we have here is that the end product, the policy, is indeed the product mandated by a state agency. And therefore, this is not a purely internal set of guidelines or policies that jails decided to create. This is mandated by state law and therefore does not fall within the exception of section 669.1. As to any prejudice resulting from the failure to give the instruction, as noted in our reply brief on pages 7 to 8, defendants have failed to rebut the presumption of prejudice resulting from the failure to give an instruction on negligence per se for violations of state law. Repeated violations of this policy by the custodial officers of the Riverside County Jail. And those violations are directly responsible for the violent death of Mr. Espinoza. If I have any time left, may I reserve that for rebuttal? Thank you. Thank you. Thank you. Good morning, Your Honors. Bruce Deason House on behalf of the appellees. The issues that were framed by counsel, do policy violations require the giving of a negligence per se instruction, I think we completely addressed in our brief, but there's one point additional that I'd like to make. If you take a look at the proposed instruction, which is instruction number 30, which you can find at page 7 and 8 of the opening brief and the appellant's volume 1 excerpts of record at pages 6 and 7. The instruction as it was proposed did not reference either alleged violation of policy. It did not talk about creating a new classification form. It did not talk about seeking approval of a supervisor to downgrade classification status. So as that instruction was proposed, it did not address either policy violation. And there would be a separate reason not to have given that instruction, notwithstanding evidence code section 669. That is, there is no evidence to support the giving of that instruction because none of the allegations that are contained in there were what was argued to the jury. What was argued to the jury is what would have been covered had those two violations been asserted in the instruction. They argued that there was no approval by a supervisor and there was no creation of a new form. The jury heard it. With the exception of plaintiff's expert, who never testified on that subject, never proffered an opinion as to whether or not that was a cause of the incident, that was a violation of policy. Everything else that they talk about in that instruction was not the basis of counsel's argument to the jury that the county, and in particular Deputy Pendleton, should be held responsible for Mr. Espinoza's death. With respect to Deputy Vera, there is no allegation she violated any aspect of the policy. In the opening brief, there is no reference to any violation that she made. In the reply brief for the first time, and we contend that this particular issue has been weighed, that somehow she failed to review Jim's classification notes prior to reviewing Mr. Espinoza or Mr. Alvarez for cohabitation. First, she did testify she reviewed Jim's notes, but even more importantly, that's not an aspect of the policy in any way, shape, or form. So there is no evidence that would have permitted the giving of this particular instruction as to Deputy Vera. I think the case law is relatively clear that Title 15, Section 1050, creates no standard of care whatsoever. All it does is mandate the creation of a policy. The county has a policy. There's no dispute about that. The California State Legislature, when they passed Evidence Code 669.1, did it for a specific reason. We provided the Court with a legislative history behind the reason. There is no indication that in the record, in either of the briefs filed by appellants, that there was proof that this particular policy was adopted as an ordinance. There's certainly no indication that it's a regulation under APA, even if the county had the authority to do it, which I don't believe it does. And there's certainly no statute in play. And additionally, I believe the Ninth Circuit even recently recognized that an internal manual, and I'm now referring to the Steinle case, which was decided in 2017, made it clear that absent formal adoption as an ordinance or a regulation, internal policies cannot be the basis for a negligence per se instruction. Additionally, as we pointed out to the Court, under Evidence Code Section 669, plaintiffs have the burden to prove causation. There is no evidence in the record, and certainly nothing referenced in either of the appellant's briefs, that talk about how they have established that a violation of these policies caused this incident to occur. There is no evidence that filling out a new form would have changed anything. There was no evidence that, had this new form been submitted to a supervisor, that the downgrade would not have been approved. In fact, all of the evidence shows exactly the contrary. And that came from Deputy Pendleton. It came from Sergeant Taylor. And it came from Robert Fonzi, the defendant's police practices expert. And last, though certainly not least, the jury was instructed on negligence. What did the evidence show about why it was appropriate for Espinoza to be in Day Room 3? I'm sorry? What did the evidence show about why it was appropriate to put Espinoza in Day Room 3? Deputy Pendleton testified at length that because of the plaintiff, because of the decedent's age, his medical history, his previous history of assault, the concern that he had about the type of inmates that would have access to him if he remained at Level 5 as opposed to the lower classification. And he was with other mental health patients. Given his physical condition, he felt it was appropriate, it was safe for him in that environment as opposed to any other. Sergeant Taylor corroborated that, as did Mr. Fonzi. And Mr. Fonzi is no stranger to jail regulations. He sat on the post commission that sets Title 15 standards for correctional facilities throughout the state of California. And he himself had run the largest detention facility in San Bernardino County, the West Valley Detention Center, which housed almost 4,000 inmates. The jury had the opportunity to assess the behavior of both Deputy Vera and Deputy Pendleton. Hearing all of the evidence, they concluded that under the circumstances what they did or did not do was appropriate. I don't think there's a single thing in that proposed instruction, and I don't think even if that instruction had been properly written to reflect the two violations, there is any evidence in the record that suggests there's a reasonable chance that if the jury had been given that instruction, they would have reached a different result. Unless the Court has questions, I'm submitting. I think your co-counsel has a question. Well, one other point, Your Honor, and again. There was no evidence of violent behavior that involved Mr. Alvarez and his cellmates, and they had been together in a day room for more than a month with no incidents, and they had been together in that cell for a significant period of time without incident. So I don't think there's any evidence that would establish that a different. But what happened the day of the murder? I mean, what happened that Mr. Espinoza ended up dead? No one really knows, unfortunately. Mr. Alvarez was not forthcoming after this incident occurred. There's a lot of supposition that the decedent had been stealing from him, which I understand not to be an unusual occurrence inside the jails, but I don't believe we'll ever know what caused that incident to occur. Thank you, counsel. Thank you, Your Honors. First, Your Honors, with respect to the proposed instruction, I think counsel's observation shows a fundamental misunderstanding of what a jury instruction is. If I had submitted a jury instruction referencing specific factual issues, it would have been rejected as being argumentative on the facts. A jury instruction merely provides a framework for argument for facts. And if you look at the last sentence of the instruction, the opening brief on page 7, footnote 1, the last sentence is, The classification of inmates is designed to enhance the security and safety of staff and inmates. And once that instruction is in, then the argument covers all the specific instances of the policy that were violated, which were covered in both our reply brief and our opening brief on the pages referenced before. Secondly, counsel merely glosses over what Section 1050 states. Section State 1050, after ordering local jails to implement these policies, states that the classification plan is to assign inmates to housing units according to sex, age, criminal sophistication, seriousness of crime charge, physical or mental health needs. In answer to Judge Wardlaw's question, there's no reason why Mr. Espinoza should have been assigned to a mental health unit. He didn't have any mental health issues. And he's assigned with, and the evidence showed that everyone assigned to those, to the mental health unit, exhibited some kind of bizarre behavior or had some problems with their cellmates and were constantly being moved one from the other. The only reason he was assigned there is because the custodial officers, in violation of policy, decided that, oh, maybe he'll be better off there than some other place. That's the only reason he was assigned there. And in terms of what happened, evidence was presented that someone else who was in the cell next to Mr. Alvarez and Mr. Espinoza heard Mr. Espinoza yelling while he was being beaten by Mr. Alvarez. So it's pretty clear why, how he died. He was beaten to death by Mr. Alvarez, who had serious mental issues. And also, contrary to what counsel has stated in the Jim's record, showed that he had, he was charged with an assault with a deadly weapon. And during that assault with a deadly weapon, he made racial remarks towards Mexicans. And saying that he was going to kill them. So there was plenty of evidence in the record of violence. He was charged with a violent offense. There was absolutely no reason to place Mr. Espinoza first in the mental health unit. And more importantly, to place him in the same cell as Mr. Alvarez, who the day before he killed him, threw out Mr. Espinoza's clothes and wouldn't let him back in. And there was a videotape of that of Mr. Espinoza trying to get back in. My time's up, I guess. Thank you, counsel. Thank you. Thank you both very much. The case, as argued, will be submitted.
judges: Reinhardt, Fernandez, Wardlaw